# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JOEL BROOKS,                           )
                                       )
        Plaintiff,                  )     No. 1:11-cv-00089
                                       )     Chief Judge Haynes
v.                                     )
                                       )
CHARTER COMMUNICATIONS, LCC,           )
                                       )
        Defendant.                  )

## M E M O R A N D U M

Plaintiff, Joel Brooks, a Tennessee citizen, originally filed this action in the Circuit Court for

Maury County, Tennessee, against Defendant, Charter Communications, LCC, a Delaware limited

liability company with its principal place of business in Missouri. Defendant removed this action to

this district under the federal diversity statute, 28 U.S.C. § 1332. Plaintiff's claim is that Defendant,

Plaintiff's former employer, discharged him in retaliation for his filing a worker's compensation

claim.

Before the Court is the Defendant's motion for summary judgment (Docket Entry No. 21)

contending, in essence that Plaintiff cannot establish a prima facie case of retaliatory discharge

because Plaintiff's proof fails to establish any causal connection between Plaintiff's worker's

compensation claim and his termination. Defendant contends that Plaintiff cannot prove that

Defendant's legitimate business reason for the discharge is mere pretext. In response, Plaintiff

contends that genuine issues of material fact exist, precluding summary judgment. (Docket Entry No.

28).

For the reasons below, the Court concludes that Plaintiff fails to meet his <u>prima facie</u> burden

to prove retaliatory discharge and also lacks any proof that Defendant's stated reason for terminating Plaintiff was mere pretext. Thus, the Court concludes that the Defendant's motion for summary judgment should be granted.

## A. Findings of Fact[1]

In 2004, Defendant hired Plaintiff as an Installation Repair Technician in Columbia, Tennessee. (Docket Entry No. 23-1, Brooks' Deposition at p 18). Plaintiff's job included retrieving customer equipment, performing disconnects and collecting past due bills. Id. at p 15. Defendant later promoted Plaintiff to: Broadband Technician I; Broadband Technician II; Broadband Technician III; and Broadband Technician Senior. (Docket Entry No. 29 at ¶¶ 3-5). Each promotion involved additional complex tasks. Id. at ¶ 6. Plaintiff received some training throughout his employment. Id. at ¶ 7.

During his employment, Plaintiff reported to several supervisors: Scott George, Rodney Isbell and Dan Sawvell. Id. at ¶ 8. At the time of Plaintiff's termination, Sawvell was Plaintiff's supervisor. Id. at ¶ 9. Sawvell reported to Alan Shumaker, Defendant's senior manager of technical operations. Id. at ¶ 10. Plaintiff testified that he had a bad working relationship with Sawvell: "Dan would actually call you names. He got physical, slammed me up against the wall one time. He was pretty rough." (Docket Entry No. 23-1, Brooks' Deposition at p 26:4-6).

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court concludes that there are some factual disputes, but those disputes are not material given the material facts conceded by the Plaintiff. Thus, this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

# 1. Defendant's Policy of Corrective Action

Plaintiff received a copy of Defendant's employee handbook (Docket Entry No. 23-1, Brooks' Deposition at p 17) providing that "[a]ll employees, regardless of job title or work performed, are expected to: [p]erform their job in a manner that meets or exceeds expectations." (Docket Entry No. 23-3, Defendant's Employee Handbook at 48). If an employee fails to meet or exceed expectations, the employee handbook provides for corrective action:

> The main purpose of any corrective action is to identify, correct, and prevent recurrence of a performance problem or incident of misconduct, and to plan for your success in your position. Although employment with Charter is at-will, the Company may use corrective action under this policy at its discretion. In addition, your supervisor may provide coaching and counseling in the normal course of business. In some instances, a detailed Performance Improvement Plan (PIP) may be administered. **Formal corrective action may include any one of the following steps: verbal warning, written warning, final warning, suspension (with or without pay), or termination of employment.** There are certain types of performance problems or misconduct that are serious enough to justify accelerating these corrective action steps, including immediate termination, without going through the progressive corrective action process. **Depending on the severity of the offense and the employee's performance and corrective action history, there may be circumstances in which one or more steps are bypassed as determined by the Company. Although it is impossible to list every type of behavior that may be deemed a serious offense, employees can expect to be subject to corrective action, up to and including termination of employment, for violating any of the policies or standards of behavior set forth in this Handbook and any of the Charter polies posted on *UptoSpeed.*** In addition, any behavior or act that would violate standards of common courtesy, decency, workplace conduct, or common sense, that is not specifically addressed in this Handbook, also may lead to correction action, up to and including termination.

Id. at 49-50 (emphasis added).

The corrective action process includes a verbal warning, a written warning, a final written warning and ends with a termination. (Docket Entry No. 23-2, Wilson's Deposition at p 17). Supervisors may also provide coaching and counseling throughout the corrective action process to

identify, correct and prevent misconduct or performance based problems. Id. at p 20. Coaching is when the supervisor sits down with an employee to discuss performance issues or to congratulate an employee who exceeds expectations. Id. Coaching sessions may occur on multiple occasions and at any level in the corrective action process. Id. The termination process for a technician takes an average of seven to eight months. (Docket Entry No. 23-8, Shumaker's Deposition at p 13).

## 2. Plaintiff's Job Performance

In 2008, Defendant began focusing on the Technical Quality Assurance ("TQA") program, designed to increase customer satisfaction and prevent future trouble calls. (Docket Entry No. 29 at ¶ 22). To pass a TQA inspection, a technician is required to score ninety (90) percent or above. Id. at ¶ 25. Plaintiff received a copy of the TQA form used during inspections and knew that Defendant required TQA scores of at least ninety (90) percent. (Docket Entry No. 23-1, Plaintiff's Deposition at p 59).

In 2009 and 2010, Plaintiff received an overall year-end result of "meets expectations" in his performance evaluation. (Docket Entry No. 23-9 at 16, 19). Yet, in the specific category of "on site TQA quality inspections" Plaintiff "d[id] not meet expectations," reflecting that Plaintiff did not receive a passing score in either 2009 or 2010. Id. Plaintiff's average TQA score from January 10, 2010 to April 14, 2011 was 64.12 out of 100. (Docket Entry No. 29 at ¶ 30).

Plaintiff's corrective action process began in 2009. On September 18, 2009, Plaintiff received a verbal warning, step one in the corrective action process. (Docket Entry No. 23-9 at 21). The reason for the warning stated: "Joel's unscheduled time away from work has exceeded his benefit time allotted. This is a violation of policy." Id. The report warned that "[f]urther violations of this or any other Charter Communications policy or procedure will result in further corrective action up

to and including termination of employment." Id. Plaintiff signed the report. Id.

On May 17, 2010, Plaintiff received a written warning, step two in Defendant's corrective action process. Id. at 18. The reason for the warning was: "Joel continues to fail TQA inspections. This is a violation of company policy." Id. This report reflected that Plaintiff had three prior coaching sessions on performance. Id.

On December 9, 2010, Rodney Isabel met with Plaintiff to discuss performance. (Docket Entry No. 23-3, Incident Investigative Report at 74). "[Plaintiff] stated he has spoken to [the] TQA inspector multiple times to find out why [Plaintiff] is failing. [Plaintiff] said the inspector sa[id] it is the small things [Plaintiff] is missing." Id. At this meeting, Isabel told Plaintiff "his job may be in jeopardy if [Plaintiff] continues to fail." Id. Plaintiff said he understood and indicated that he would like to improve. Id.

On January 14, 2011, Plaintiff received his final written warning, step three in the corrective action process. (Docket Entry No. 23-4 at 7). The reason for the final written warning was: "Joel continues to fail TQA inspections. This is a violation of company policy." Id. The final written warning also states that "Employee has been advised that further violations of company policies will lead to termination of employment." Id. Plaintiff signed the report. Id.

In March 2011, Defendant evaluated Plaintiff's behaviors over eight categories: simplicity; customer focused; integrity; teamwork oriented; nimble; innovation; accountability; and ownership. (Docket Entry No. 23-9 at 17). Plaintiff received a rating of "d[id] not meet expectations" in three categories:

| Category | Definition | Examples of Specific Behaviors Observed |
|---|---|---|
| Integrity | Do what's right - always | Unfortunately Joel opts for what is easy. This is evidence by his TQA scores. |

5

| Accountability | We're disciplined with out execution and accountable for our actions | Joel accepts when his action cause corrective action. Unfortunately nothing changes to show improvement. |
| Ownership | Act like an owner | Joel often take the easy was out to accomplish tasks. This has gotten better but I cannot ignore the lack of ownership. |

Id.

On May 6, 2011, Sawvell met with Plaintiff to discuss Plaintiff's performance. (Docket Entry No. 29 at ¶ 32). Sawvell discussed three addresses that failed TQA inspections. Id. at ¶ 33. Sawvell testified that Plaintiff's response was that "[t]o be honest with you, Dan, just didn't feel like doing it." Id. at ¶ 34. Sawvell also testified:

**Question:** Mr. Sawvell, did you have any problems or did Charter have any problems with – with Mr. Brooks regarding any disconnects?

**Sawvell:** Yes, we did.

**Question:** What were the problems?

**Sawvell:** He simply didn't do them.

**Question:** What do you mean he didn't do them?

**Sawvell:** We get work order like we talked about the PDA. When there were disconnects, he would address on the PDA as if he did it, but he did not.

**Question:** Okay. Did someone speak to him about that?

**Sawvell:** I spoke to him about it.

**Question:** What was his response to you?

**Sawvell:** He just said he thought he would get back to them and he forgot, so . . .

\* \* \*

**Question:** How was Mr. Brooks' attitude toward the TQAs?

**Sawvell:** When we talked about it, most – I didn't have a whole lot of opportunity, but the time we did talk, he seemed indifferent like it didn't – wasn't important.

**Question:** Now, when Mr. Shumaker made a recommendation to terminate Mr. Brooks, and did you believe that Mr. Brooks' performance was going to improve?

**Sawvell:** No. Based on the last conversation we had.

**Question:** That was the last conversation on May 6th of 2011?

**Sawvell:** Yes.

**Question:** How was he during that conversation?

**Sawvell:** He listened well, but, again, it just seemed like he didn't really care. You know, it wasn't a priority to him.

(Docket Entry No. 23-5, Sawvell's Deposition at pp 86-88).

Plaintiff's Incident Investigative Report reflects his corrective action coaching sessions:

| EMPLOYEE HISTORY OF PREVIOUS CORRECTIVE ACTION | | | |
|---|---|---|---|
| Date | Action Level | Category | Summary |
| 01/28/10 | Coached | Performance | Audit found that Joel Failed TQA inspection of 4 out of 4 jobs that were checked for the month of January. No excuse was given. |
| 02/11/10 | Coached | Performance | Audit found that Joel failed TQA inspection of 4 out of 5 jobs that were checked for the month of February. No excuse was given. |
| 03/03/10 | Coached | Performance | Audit found that Joel failed TQA inspection 4 out of 10 jobs that were checked for the month of March. Joel said he didn't know why he wasn't motivated enough to complete the work correctly. He wants to do better. |
| 08/10/10 | Coached | Performance | Failed TQA scores |
| 09/02/10 | Coached | Performance | Failed TQA scores |
| 10/10/10 | Coached | Performance | Failed TQA scores |
| 11/04/10 | Coached | Performance | Failed TQA scores |

| 12/09/10 | Coached | Performance | Since Joel's verbal CAR no improvement has been shown. Current data shows an average of 63.63 since his verbal. In November, 6 of 10 TQAs have failed with a score of 60% or below. |
|---|---|---|---|

(Docket Entry No. 23-3, Incident Investigative Report at 73).

Plaintiff testified that he never received any training pertaining to "what [Defendant] was looking for in the TQA scores." (Docket Entry No. 23-1, Plaintiff's Deposition at p 59). In addition, Plaintiff testified that he "[t]ried to get feedback on what was missing, why the grades" but was unable as "[Defendant] wouldn't tell us what we messed up on or anything like that. One time [Sawvell] did bring me three addresses . . . . And he asked me about three different addresses, and I told him what I remembered about them." Id. Plaintiff also stated that he "knew some of the other guys that had low scores actually had a trainer come down and ride with them and help them out. I never got that opportunity." Id. at p 60. Yet, Rosser, a TQA inspector for Defendant, testified that Plaintiff asked him for help to improve his TQA scores and that Rosser helped Plaintiff. (Docket Entry No. 23-7, Rosser's Deposition at p 53).

### 3. Plaintiff's Injury and Worker's Compensation Claim

On April 13, 2011, Plaintiff injured his right wrist and elbow while running an outlet in a customer's basement. (Docket Entry No. 29 at ¶ 46). Plaintiff called his supervisor, Jeff Crowder. (Docket Entry No. 23-1, Brooks' Deposition at p 53). Crowder took Plaintiff to Worker's Health where Plaintiff had his wrist set and received a pain reliever prescription. Id. Crowder paid for Plaintiff's prescription and later received reimbursement through worker's compensation. Id. at p 54-55.

Connie Wilson, a human resources generalist for the Defendant, handled Plaintiff's worker's

compensation claim. (Docket Entry No. 23-2, Wilson's Deposition at 4-5). Whenever an employee is injured on the job, the supervisor contacts Wilson to report the injury. Id. at 5. Wilson arranges a panel of physicians for the employee and the employee chooses a physician for treatment. Id. If an employee is recommended for light duty, Wilson arranges the light duty. Id. at 6. Defendant's worker's comp carrier, Broadspire, approves the physicians, specialist and treatment for the employee. Id. Defendant's role in a worker's compensation claim is submitting the claim to Broadspire and assisting an employee if there is any difficulty in obtaining services. (Docket Entry No. 23-9, Tester's Deposition at p 17).

On April 15, 2011, Plaintiff received treatment from Dr. Hunter at Middle Tennessee Bone and Joint Clinic. Id. at p 55. Dr. Hunter approved Plaintiff for three weeks of light duty work and recommended physical therapy. Id. at p 55. Defendant accommodated Plaintiff's need for light duty and Plaintiff worked in the warehouse and did not miss any days of work. Id. at p 55-56. Plaintiff did not receive physical therapy because the worker's compensation provider did not approve the physical therapy. Id. at pp 55.

On May 5, 2011, Dr. Hunter examined Plaintiff for a check up and placed Plaintiff on an additional three weeks of light duty for the remainder of May. Id. Plaintiff continued working light duty in the warehouse and reporting to Crowder. Id. at p 56-57.

### 5. Plaintiff's Termination

Defendant's termination process begins when the employee's supervisor recommends termination of an employee. (Docket Entry No. 23-2, Wilson's Deposition at p 29). The human resources generalist gathers the employee's information that is forwarded to the human resources director. Id. The human resources director then forwards the recommendation to Defendant's legal

counsel. Id. Defendant's legal counsel must approve the termination of an employee. Id. at p 35.

On May 11, 2011, Defendant terminated Plaintiff's employment. Plaintiff's corrective action report cites that "Joel continues to fail TQA inspections. This is a violation of company policy." (Docket Entry No. 23-9 at 14). Shumaker testified regarding Plaintiff's termination:

**Question:** Mr. Shumaker, did you make a decision to terminate Mr. Brooks?

**Shumaker:** What do you mean? Was that my own individual – yes. I thought, based on his score, he should be terminated, if that's what you are asking.

**Question:** Yes. That's what I'm asking.

**Shumaker:** I didn't really make the decision. It was up to the supervisor, like I had said, doing his corrective action. But, no, I feel that he had been on the report way too long.

**Question:** Okay. And was that the only reason that you took into consideration in terminating – in terminating Mr. Brooks that he was on the report too long?

**Shumaker:** Yeah, basically, off and on. He was off and on for a couple years, and his name was on my radar. So after his cores did not meet the standard after, like I said, seven months or so, the decision was made to terminate him, yes.

**Question:** And you knew when you terminated him that he had a worker's comp claim, didn't you?

**Shumaker:** I knew when we terminated him that he had hurt himself recently before that. That is correct, but I believe the paperwork that was submitted was prior to his injury. I am not exactly sure, but I believe – his termination, I would say, was probably already in the works, and then he hurt his wrist, I believe, or his arm. And then he was on light duty to awhile.

(Docket Entry No. 23-8, Shumaker's Deposition at p 19-20).

Plaintiff testified at his deposition as to the following exchange between himself and Sawvell:

**Question:** Did he tell you why you were being terminated?

**Plaintiff's Answer:** He said because of performance. And he showed me a sheet that had, like I said, all these different things listed on it. And I told him, I said, "Dan this isn't right." That's when Ms. Wilson said, "It doesn't matter if it's right. You're being terminated. Just sign it." I said, "I'm not signing anything." And Dan said, "It doesn't matter if you sign it or not." So I didn't sign it.

(Docket Entry No. 23-2, Brooks' Deposition at p 77). In addition, Plaintiff testified that the reason for his termination was because of his filing of a worker's compensation claim, citing that Mark Tank told him that "Dan [Sawvell] made the comment that that's why I was fired, because I was milking being hurt, and he didn't believe I was really hurt." (Docket Entry No. 23-1, Plaintiff's Deposition at p 91).

### B. Conclusions of Law

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee notes. Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact.

> **As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.** Factual disputes that are irrelevant or unnecessary will not be counted.

Id. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electrical Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326. Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989); see also Routman, 873 F.2d at 971.

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Celotex Court:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

477 U.S. at 323 (emphasis deleted).

As the Sixth Circuit explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v.

Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex, 477 U.S. at 322 and Rule 56(e)).

Once the moving party meets its initial burden, the Sixth Circuit warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion. . . . [and] must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby, 477 U.S. at 251, 255). Moreover, the Sixth Circuit explained that

> The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.'

Street, 886 F.2d at 1480 (citations omitted); see also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790 (6th Cir. 1990) (quoting Liberty Lobby, 477 U.S. at 151-52) ("A court deciding a motion for summary judgment must determine `whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.").

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, **summary judgment will not lie if the dispute about a material fact is `genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party**.

13

\* \* \*

Progressing to the specific issue in this case, we are convinced that **the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits**. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. **The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'**

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citations omitted and emphasis added).

It is likewise true that

[I]n ruling on motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Sixth Circuit stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Co.</u>, 791 F.2d. 43, 46 (6th Cir. 1986) (citation omitted).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient

14

to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of."

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (citation omitted). In this district, the parties must provide specific references to the proof upon which they rely. See Local Rule 56.01(c) (requiring each party to provide a statement of undisputed facts to which the opposing party must respond).

In Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989), the Sixth Circuit discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.   As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.   The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.   The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.   The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.  The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Id. at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) whether the moving party "clearly and convincingly" established the absence of material facts;  (2) if so, whether the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense; (3) if factual support is presented by the nonmoving party, whether those facts are sufficiently plausible to support a jury verdict or judgment under the applicable law; and (4) whether there are any genuine factual issues with respect to those material facts under the governing law?

In diversity actions, a district court applies the substantive law of the state. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). Under Tennessee law, a claim of retaliatory discharge requires a

plaintiff employee to show:

> (1) []he was an employee of the defendant at the time of the injury,

> (2) []he made a claim against the defendant for workers' compensation benefits,

> (3) the defendant terminated h[is] employment, and

> (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate h[is] employment.

Cooper v. Wyndham Vacation Resorts, Inc., 570 F. Supp. 2d 981, 985 (M.D. Tenn. 2008) (citing

Anderson v. Standard Register Co., 857 S.W.2d 555, 558 (Tenn.1993)). Here, the first three elements

of Plaintiff's retaliatory discharge claim are not in dispute.

To prove the fourth element, however, Plaintiff "must show either **direct** or '**compelling**

**circumstantial' evidence** of a causal connection between the workers' compensation claim and the

termination, not just the fact that the latter followed the former." Cooper, 570 F. Supp. 2d at 985

(emphasis added) (citing Frizzell v. Mohawk Indus., No. M2004-01598-COA-R3-CV, 2006 WL

1328773, *10 (Tenn. Ct. App. May 15, 2006)). Plaintiff may rely upon circumstantial proof to prove

retaliatory discharge, including:

> the employer's knowledge of the compensation claim, the expression of a negative attitude by the employer toward an employee's injury, the employer's failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees, sudden and marked changes in an employee's performance evaluations after a workers' compensation claim, or evidence tending to show that the stated reason for discharge was false.

Newcomb v. Kohler Co. 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006) (citations omitted). For

example, "[t]emporal proximity may also serve as evidence of causation **if the plaintiff's prior job**

**performance was otherwise satisfactory.**" Cooper, 570 F. Supp. 2d at 986 (emphasis added and

citation omitted); see also Newcomb, 222 S.W.3d at 391 ("Moreover, an employee cannot rely on

the mere short passage of time between the filing of a workers' compensation claim and subsequent termination to prove a prima facie case of retaliation.").

"A plaintiff's subjective beliefs, mere speculation, or testimony that the employee can think of no other reason for the discharge cannot, in and of themselves, create the requisite causal relationship." Id. Yet, evidence of a "defendant's willingness to have the plaintiff return to work serves to undercut an argument for retaliatory intent." Cooper, 570 F. Supp. 2d at 987-988 (citing Johnson v. St. Francis Hosp., Inc., 759 S.W.2d 925, 928 (Tenn. Ct. App. 1988)).

Assuming Plaintiff makes a prima facie showing of retaliatory discharge, "the defendant then bears the burden of proving that there is a 'legitimate non-pretextual reason for the employee's discharge.'" Cooper, 570 F. Supp. 2d at 988 (quoting Anderson v. Standard Register Co., 857 S.W.2d 555, 559 (Tenn. 1993)). If the employer presents a non-pretextual reason for the discharge, the "burden shifts back to the employee to prove the employer's explanation is pretextual . . . [with] 'specific admissible facts, which realistically challenge the defendant's stated reasons.'" Frizzell, 2006 WL 1328773 at *3 (citations omitted). This burden is satisfied if the employer's stated reason for termination "'have no basis in fact, or if they have a basis in fact, by showing that they were not really factors motivating the discharge, or if they were factors, by showing that they were jointly insufficient to motivate the discharge.'" Id. (citations omitted). The Plaintiff employee, however, "faces summary dismissal of his claim if he is unable to demonstrate that he could prove the employer's reason for the discharge was pretextual." Id.

In its motion for summary judgment, Defendant contends that Plaintiff cannot prove that the worker's compensation claim was a substantial factor in his termination. (Docket Entry No. 22 at 12). Defendant asserts that the temporal proximity of the events and Plaintiff's subjective belief as

18

to why Defendant discharged him are insufficient to meet his prima facie burden. Id. at 13. The

Defendant contends that its process for termination of an employee is lengthy. Id. at 14. The

Defendant also asserts that Plaintiff had been injured in the past without any adverse acts by the

Defendant. Id. In addition, Defendant contends that Plaintiff's low TQA scores constitute legitimate

business reasons for termination and Plaintiff is unable to prove pretext. Id. at 15.

For his retaliatory discharge claim, Plaintiff cites the following as establishing a causal

connection between his worker's compensation claim and his termination:

> 1. Defendant's knowledge of Plaintiff's worker's compensation claim as Defendant
> referred him to the worker's compensation carrier and accommodated his light duty;

> 2. Defendant had a negative attitude toward Plaintiff's injury as Defendant ignored
> the Doctor's recommendation for physical therapy until one month after Plaintiff's
> injury and Crowder and Sawvell criticized Plaintiff as "just 'sitting around' in the
> warehouse;"

> 3. Defendant did not follow company policy in carrying out Plaintiff's termination
> because there is no evidence to show that Defendant's legal department approved the
> termination, there is no incident report and Plaintiff never had an opportunity to make
> a statement.

(Docket Entry No. 28 at 16-20). Plaintiff also asserts that he presents "compelling evidence" of a

causal connection because

> he had low TQA scores for more than two years without being terminated, that he
> always met expectations on his annual performance reviews, that he got a merit raise
> the same month he was injured, one month prior to his termination, that he was
> meeting his goals in 2011, and that he has mostly passing TQA scores during 2011.

Id. at 20.

Yet, Defendant contends that Plaintiff misconstrues the testimony, focuses on immaterial

facts and incorrectly cites the record. (Docket Entry No. 36 at 3). Defendant asserts that Plaintiff's

supervisor, Sawvell, was unaware that Plaintiff's light duty had been extended for another three

weeks at the time of Plaintiff's termination. Id. at 3-4. In addition, Defendant argues there is not any

evidence of Defendant's negative attitude toward Plaintiff's worker's compensation claim. Id. at 4.

As to Plaintiff's contention that Sawvell and Crowder criticized Plaintiff for "sitting around,"

Defendant cites the following testimony:

> **Crowder:** Injuries like that, there is nothing we – he can do or we can have him do. So a lot of times it will be sitting in the office. If we could find something very simple to do, then we ask if he can do it under the restrictions. I don't remember Joel given any tasks to do. I just recall seeing him sitting around a lot, which is fine because you are on light duty.
>
> ***
>
> **Question:** Okay. You ever tell him to hurry up and get over with it, get to work?
>
> **Crowder:** No.
>
> **Question:** Did you ever say anything to him like, you know, you are milking it, being on light duty?
>
> **Crowder:** No. I did not personally say that to him.
>
> **Question:** Did you ever say that to anyone?
>
> **Crowder:** No. I'm not a doctor. I can't judge somebody's injury.
>
> **Question:** You ever feel like people were milking the worker's comp system?
>
> **Crowder:** No. We as a company of what work we do, I feel, in my own opinion, we don't have as much workman's comp claims as the majority of telecommunication companies. We work safe. We are trained. Accidents do happen. I don't' feel like we have ever had an overwhelming problem with that there.
>
> **Question:** If someone is out of work on light duty like that, does that mess up your work schedule?
>
> **Crowder:** No.
>
> **Question:** Did you ever call him a pussy for not coming back to work early?
>
> **Crowder:** I do not ever recall calling him names other than Joel Brooks.

(Docket Entry No. 23-6, Crowder's Deposition at 23:14-20 and 26:17-27:11). Defendant also

contends that Plaintiff misconstrues Defendant's corrective action process as failing to adhere to company policy because Defendant does not have the cited seven step plan for termination. (Docket Entry No. 36 at 6-7). Defendant described its compliance with its lengthy corrective action process and its provision of many coaching sessions for Plaintiff to improve his performance. Id. at 8.

Here, Plaintiff had a failing average TQA score for the two years prior to his termination. Plaintiff received his first written warning in 2010 regarding his failing TQA scores. Plaintiff received his final written warning regarding his failing TQA scores in January 2011, approximately five months before his termination. In March 2011, Plaintiff's behavior evaluation showed he "d[id] not meet expectations" in three categories, integrity, accountability and ownership. Plaintiff also had opportunities to remedy his substandard performance in his numerous coaching sessions. Plaintiff, however, presents some evidence that his worker's compensation claim may have been a substantial factor in his termination because Defendant did not take any action to terminate him until after his claim was filed. In addition, Plaintiff testifies to the bad working relationship between himself and Sawvell. Thus, the Court concludes that Plaintiff has met his initial burden to show that his worker's compensation claim may have been a substantial factor in his discharge.

As to Defendant's legitimate business reason for discharge, Defendant cites Plaintiff's continued failure of his TQA inspections a legitimate reason for discharge. (Docket Entry No. 22 at 13-14). Plaintiff was documented as failing TQA inspections since 2009. Passage of the TQA inspection is a requirement of continued employment under Defendant's employee handbook. Id. Thus, the Court concludes that Defendant has articulated a legitimate, non-pretextual reason for plaintiff's discharge: "substandard work performance and inability to meet legitimate expectations, . . . are certainly legitimate reasons to terminate." Spagnola v. Humana, Inc., No. 3:09-cv-235-H,

2010 WL 59250, at *6 (W.D. Ky. Jan. 6, 2010).

Plaintiff next contends that Defendant's reason for discharging Plaintiff is mere pretext and genuine issues of material fact preclude summary judgment. (Docket Entry No. 28 at 20-21). Specifically, Plaintiff cites that Defendant did not terminate Plaintiff during his prior two years of low TQA scores, but only took action after Plaintiff filed a worker's compensation claim. Id. Plaintiff asserts that during the four months prior to his termination his TQA scores greatly improved, but Plaintiff does not cite his improvement in this record. Id. at 21. Plaintiff also asserts that Defendant lacks any documentary evidence of its plans to terminate Plaintiff prior to Plaintiff's second doctor's visit on May 5, 2011. Id. In response, Defendant contends that Plaintiff was terminated because he had substandard performance for two years. (Docket Entry No. 36 at 8). In addition, Defendant asserts that Shumaker testified that he believed Plaintiff's termination paperwork was submitted prior to Plaintiff's injury, id., and the record reflects that Rodney Isabel informed Plaintiff that he was in danger of termination if he did not improve his performance on December 9, 2010. (Docket Entry No. 23-3, Incident Investigative Report at 74).

The Court concludes that Plaintiff had a history of substandard work performance and that he cannot prove pretext. Plaintiff continued to fail TQA inspections and continued with coaching sessions, but failed to improve his performance. Plaintiff received his verbal warning on September 18, 2009, his first written warning on May 17, 2010 and his final written warning on January 14, 2011. In addition, on December 9, 2011, Plaintiff was warned that his continued failings might lead to termination. Each of these events in Defendant's corrective action process, that ends in termination, occurred prior to his April 2011 injury and his filing of the worker's compensation claim. Plaintiff's performance was also evaluated in March 2001 and Plaintiff received failing scores

in three categories: integrity; accountability; and ownership. Finally, Plaintiff was terminated on May 6, 2011, before his supervisor had knowledge that Plaintiff received another three weeks of light duty. Thus, the Court concludes that Plaintiff cannot demonstrate that Defendant's reasons for terminating Plaintiff were pretextual.

### C. Conclusion

For these reasons, the Court concludes that the Defendant's motion for summary judgment (Docket Entry No. 27) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the *10th* day of December, 2012.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court